Filed 12/23/21  Farmer v. Collins CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| ERICA FARMER, | B302578 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. SF001701) |
| SHAWN COLLINS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rolf M. Treu, Judge.  Affirmed in part, dismissed in part.

Shawn Collins, in pro. per., for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

# INTRODUCTION

Appellant-father Shawn Collins appeals from an August 2019 judgment entered after trial, awarding primary physical custody of his daughter Alyssa (then 11 years old) to Alyssa's mother, respondent Erica Farmer.[1] Father contends numerous errors occurred in the proceedings below. Specifically he argues: (a) the court erred in November 2017, in ordering him to undergo hair follicle drug testing; (b) the court erred in December 2017 and January 2018, in granting Mother's ex parte request to alter Alyssa's custody arrangements based on his failure to submit to hair follicle testing; (c) the court denied Father due process by receiving into evidence at the April 2019 trial a custody evaluation report; (d) the court failed in its duty to "recognize . . . collusion" between Mother's counsel and the custody evaluator; (e) the court erred in denying Father's request to continue the April 2019 trial; and (f) the court violated Father's due process rights at trial in various ways. Father's notice of appeal also claims he is appealing from an order denying a motion for a new trial. Because his brief is devoid of arguments as to why that order was erroneous, we deem that portion of the appeal abandoned. (See, e.g., *In re Sade C.* (1996) 13 Cal.4th 952, 994 ["An appealed-from judgment or order is presumed correct. . . . Hence, the appellant must make a challenge. In so doing, he must raise claims of reversible error or other defect . . . and 'present argument

---

[1]     Mother has not appeared in this appeal.

and authority on each point made.' . . . If he does not, he may, in the court's discretion, be deemed to have abandoned his appeal. . . . In that event, it may order dismissal" (citations omitted)].)

As to the remainder of his appeal, we conclude: (a) the court did not err in ordering Father to undergo hair follicle drug testing because he stipulated to that order; (b) any orders granting Mother's ex parte requests to alter Alyssa's custody arrangements in December 2017 and January 2018 were superseded by the August 2019 judgment; (c) the court did not err in receiving the custody evaluation report into evidence; (d) there was no evidence of "collusion" between Mother's counsel and the custody evaluator and, in any case, the court had no "duty" to "recognize" any such collusion; (e) the court did not abuse its discretion in refusing to continue the trial; and (f) Father's due process rights were not violated. Accordingly, we affirm.

## STATEMENT OF RELEVANT FACTS

### A. *Background*

In July 2013, Mother filed a Petition to Establish Parental Relationship, asking the court to adjudicate issues of child support, custody, and visitation as to her and Father's daughter Alyssa (born August 2008).[2] In August 2013, Father filed an ex parte Request for Order (RFO)

---

[2] Mother and Father were never married.

3

seeking immediate custody of Alyssa, alleging that Mother had been arrested and charged with domestic violence. The court (Commissioner Matthew C. St. George) awarded Father temporary custody of Alyssa and set an October hearing. At the October hearing, of which Mother claims she was unaware, the court granted Father sole legal and physical custody of Alyssa, with reasonable visitation to Mother.

In October 2013, Mother filed an RFO seeking custody of Alyssa, claiming her arrest for domestic violence had been orchestrated by an "anonymous call" and was without merit. Mother additionally accused Father of selling and using drugs. Father responded that Mother's marriage and life were "saturated with alcoholism, drug abuse and economic instability." He disclaimed having any issues with drugs or alcohol and agreed to "eagerly surrender to a drug and alcohol test at a moment's notice should the Court deem such tests necessary." The court ordered a parenting plan assessment in February 2014.

At the parenting plan assessment, the parties agreed that Father would have temporary sole legal custody of Alyssa, but that Mother and Father would share physical custody, with Father having primary physical custody. Mother was required to attend daily Alcoholics Anonymous meetings for 90 days, followed by attendance thrice weekly. The parties also agreed neither would drink alcohol or use other intoxicating substances during their custodial periods. The court adopted the agreement as its order.

**B.** *The Court Awards Mother Sole Custody After Father Fails to Submit to Hair Follicle Drug Testing*

In October 2017, Mother filed an ex parte RFO seeking sole legal and physical custody of Alyssa. Mother claimed that on October 22, as she was driving from Bakersfield (where she lived with her husband) to return Alyssa to Father's custody, Father called her, sounding intoxicated, and asked if she could drop Alyssa off with a relative. He also sexually propositioned Mother. Mother drove Alyssa to the police station and explained to officers there why she was uncomfortable going to Father's apartment for the custody exchange. After police officers were unable to get Father to answer the door at his apartment, Mother returned with Alyssa to Bakersfield. Mother's RFO listed other instances in which Father was allegedly intoxicated, intended to become intoxicated, left Alyssa with others for long periods of time, or neglected her. Mother also provided proof of her sobriety, claiming to have been sober for over two years. Father submitted a declaration in which he denied the allegations or provided his own perspective on the incidents. The court (Judge Mitchell L. Beckloff) set the matter for hearing in November.

At the November 2017 hearing on Mother's RFO, the court (Judge Hank M. Goldberg) ordered a custody evaluation, as Mother sought primary custody of Alyssa in Kern County (where Bakersfield is located). Both parties agreed that the evaluation would be admissible, subject to

cross-examination of the evaluator. Additionally, because each party had alleged the other abused substances, Mother proposed they both submit to "hair follicle testing." When Father was asked whether he would submit to alcohol and drug testing, the following exchange occurred:

> "**Mr. Collins**: I mean, I will if it's necessary. I just don't think it's necessary.
>
> "**The Court**: Well, if you want to agree. It's a way of alleviating concerns and showing, gee, I'm not --
>
> "**Mr. Collins**: If they want that to happen at the mediation or whatever, I'll do it then. That can be a part of the order. I object to any drug and alcohol testing.
>
> "**The Court**: Are you okay with the court making an order for drug and alcohol testing or not?
>
> "**Mr. Collins**: Yes.
>
> "**The Court**: And normally the court doesn't do hair follicle testing unless you agree, because the hair follicle testing can test for longer periods of time and so on. Do you want to do the hair follicle testing?
>
> "**Ms. Farmer**: Please.
> "**The Court**: Are you okay about that, sir?

"**Mr. Collins**: Again, why is the court even considering it at this point?

"**The Court**: Sir, if you don't want to agree, that's fine.  If you want to agree -- some people would like to say yeah, because I want to show I'm not using alcohol or drugs or I'm not abusing alcohol or drugs.

"**Mr. Collins**: Yes, it's fine.  But at the same time, I'm saying I use alcohol, I just don't use them around my daughter.

"**The Court**: Are you using drugs?

"**Mr. Collins**: No.

"**The Court**: Including marijuana?

"**Mr. Collins**: No.

"**The Court**: All right.  So you're okay -- and there is nothing wrong -- if you're not an alcoholic there is nothing wrong with having a glass of wine or even maybe two glasses of wine in the evening.  There is nothing wrong necessarily with having a glass of wine even when you're with your kid, if you're not an alcoholic, as long as you're not driving.  So both of you are stipulating we're going to have an order for random alcohol and drug testing.  It can be through a hair follicle testing.  Is that correct, ma'am?  Is that correct, sir?

7

	"**Ms. Farmer**: Yes.

	"**Mr. Collins**: Yes."
Mother then requested that Father drug test the next day
and Father agreed.  Thereafter, the minute order reflected
that "Petitioner and Respondent agree to undergo random
hair follicle testing, on 24 hour notice, twice per month.  The
party that is requesting the test, pays for the test.[3  ¶]
Petitioner and Respondent are to go for random hair follicle
testing tomorrow."

	Father failed to appear for the test.  After he failed to
appear for two additional tests requested for later that week
and the following week, Mother filed an ex parte RFO in
December 2017, asking the court to award her primary
custody of Alyssa, and to grant her temporary custody prior
to the RFO being heard.  In Father's declaration opposing
the request, he admitted that, at the November 2017
hearing, "[t]he judge also ordered that Petitioner and I
undergo hair follicle testing for alcohol twice per month,
despite my initial objections . . . ."  However, he claimed that
at the time he agreed to the hair follicle test, he was
unaware of the cost of the exam, and would not have agreed

---

[3]	During the hearing, both parties agreed that the party
requesting that the other submit to testing would pay for it
unless the person testing was found to have "used unlawful
drugs."

8

had he known.[4]  He also stated he had selected "Jeffrey Arden" as the custody evaluator.

At the initial December hearing on Mother's RFO, Father admitted he was not in compliance with the court's drug-testing order.[5]  Despite Father's claim that he took a less expensive urine test to demonstrate he was not using drugs or alcohol, the court (Judge Thomas Trent Lewis) awarded Mother temporary sole legal and physical custody of Alyssa with no visitation for Father, pending the January 2018 hearing on the RFO.  Three weeks later, Father filed his own ex parte RFO to modify custody, requesting the court return Alyssa to his custody.

At the January 2018 hearing on both parties' RFOs, all counsel[6] confirmed that the parties had agreed to Dr. Arden

---

[4]  At a February 2019 hearing on a motion to reconsider the drug testing order, Father acknowledged that he would not have been required to pay for any testing undertaken at Mother's request.  He claimed for the first time, however, that the testing order created "an unfair playing field" because he could not afford to request Mother undergo the same test.  This argument was not included in his opposition to Mother's December 2017 RFO, nor did he articulate it at either hearing on the RFO.

[5]  Contrary to Father's concession at the hearing, in a January 2018 declaration he filed opposing Mother's RFO, Father contended he was "always in compliance with the Court Order" because the court had stated the drug test "c[ould] be" a hair follicle test, but did not mandate this type of test.

[6]  While Father appeared in propria persona for most of the proceedings (and does so on appeal), he was represented by counsel for this RFO.

as the custody evaluator, and that there had been a "*Sanchez* waiver" with regard to his report.[7] The court (Judge Carl H. Moor) found not credible Father's assertion that he did not believe he was ordered to submit to hair follicle testing, pointing to his earlier declaration otherwise, and observed that Father's credibility appeared to be "a moving target." The court also found that the drug testing order was not one made pursuant to Family Code 3041.5, but rather an order arising from a stipulated agreement between the parties.[8] The court concluded that the "reasonable inference" from Father's refusal to submit to hair follicle testing was that "he is avoiding the testing because he's dirty." The court expressly asked Father's counsel to state whether, understanding the court's view that Father was ordered to submit to hair follicle testing, and that Mother was going to pay for the testing, Father would submit to hair

---

[7] A *Sanchez* waiver "allow[s] for admission of records containing case-specific hearsay." (*People v. Johnson* (2020) 55 Cal.App.5th 96, 99, fn. 2.)

[8] Family Code section 3041.5 provides that "the court may order any person who is seeking custody of, or visitation with, a child who is the subject of the proceeding to undergo testing for the illegal use of controlled substances and the use of alcohol if there is a judicial determination based upon a preponderance of evidence that there is the habitual, frequent, or continual illegal use of controlled substances or the habitual or continual abuse of alcohol by the parent . . . ." (Fam. Code, § 3041.5.) It also provides that the court "shall order the least intrusive method of testing for the illegal use of controlled substances or the habitual or continual abuse of alcohol . . . ." (*Ibid.*)

follicle testing in the next 24 hours.  Father's counsel responded, "I don't think that he should have to prove this when he has not done anything to really place this at issue."

The court ordered that Mother would retain custody of Alyssa, with Father being granted monitored visits.  The court further ordered that the visits could become unmonitored should Father comply with any requested drug tests with clean results.[9]

### C.    *Dr. Arden Performs a Custody Evaluation*

In February 2018, pursuant to the parties' stipulation, the court (Judge Moor) appointed Dr. Jeffrey Arden as the custody evaluator.  The parties stipulated that Dr. Arden had the "right to determine the information he deems significant and relevant to the evaluation."  The stipulation additionally provided that Dr. Arden could be called to testify at trial only if a party subpoenaed him, and that "any subpoena requiring Dr. Arden [to appear] at trial . . . will be hand-delivered to his office . . . at least ten (10) court days prior to the appearance date, unless other arrangements are made with Dr. Arden prior to issuing a subpoena . . . ."  It was further stipulated that "the party requiring Dr. Arden's appearance shall deposit $3,000.00 with the subpoena at his office at least ten (10) court days prior to the appearance date to cover one day of expert witness fees."  Counsel was

---

[9]    On December 6, 2018, Father moved the court to reconsider the November 2017 drug testing order.  The court (Judge Audra Mori) denied the motion as untimely.

not permitted to "engage in unilateral communication with Dr. Arden, except for administrative matters, e.g., scheduling or billing." The stipulation reiterated that "Dr. Arden's report shall be received in evidence without foundation or objection, subject to the parties' right to engage in direct and cross-examination of Dr. Arden." The stipulation also provided that "[t]he parties understand . . . all outstanding fees must be paid prior to the distribution of the report."

On August 9, 2018, at 12:29 p.m., Dr. Arden e-mailed Mother's counsel and Father, stating the custody evaluation was finished and would be filed within the next two business days.[10] On March 12, 2019, Father moved to strike Dr. Arden's report, but the hearing date was set for May 29, 2019 -- more than seven weeks after the April 8, 2019 trial date. Nothing in the record indicates Father attempted to advance the hearing date of this motion, or requested the trial court rule on the motion.

### D. *Trial*

#### 1. Attempts to Continue the Trial

On April 3, 2019, Father filed an ex parte request to continue the trial, arguing he had received "over 400 pages of discovery" the previous day, and had not had sufficient

---

[10] By this time, Father was again representing himself and continued to do so through trial.

12

time to review the materials before trial.[11]  The court (Judge Lewis) denied the application, finding "[n]o good cause."

Trial occurred on April 8, 2019.  When the court (Judge Rolf M. Treu) asked Father if he was ready for trial, Father replied that he was not, due to discovery issues.  Father acknowledged that another judge had recently denied his request for a continuance based on the same grounds, and Judge Treu declined to revisit that denial.

### 2.      Admission of Dr. Arden's Report

Mother then raised the issue of admitting Dr. Arden's report into evidence, and both parties agreed they had stipulated to its admission subject to the cross-examination of Dr. Arden.  When the court asked Father if he agreed that "*Sanchez* was waived by stipulation on November 27, 2017," Father responded, "Yes," without arguing the waiver was invalid.  Nevertheless, Father objected to the admission of the report, explaining he had been trying unsuccessfully to subpoena Dr. Arden to testify at trial.  In response to the court's request for proof of Father's efforts, Father referenced a due diligence declaration describing a process server's failed attempts to serve Dr. Arden with subpoenas for documents.  When asked specifically whether there was a declaration demonstrating attempted service of a trial subpoena, Father claimed he did not "have that with me

---

[11]     The request did not mention his pending motion to strike Dr. Arden's report.

13

today."  The court admitted Dr. Arden's report into evidence, stating:  "If Dr. Arden shows up during the course of this trial, he may be subject to cross-examination.  But if he has not been properly served, there is no basis upon which the court has to order him to be here."  With regard to the witnesses the parties intended to call, the court asked the parties to "[b]ear in mind that the court does not wish duplicative testimony and that with respect to these witnesses that you are going to call, the court expects them to have new and fresh evidence and not just merely restate what somebody else may have said, particularly in view of the fact that the comprehensive report . . . is in evidence . . . ."

### 3.    Motions in Limine

When Father attempted to make oral motions in limine, the court asked why the motions were not in writing. Father claimed he had drafted written motions but that the "discovery issues . . . didn't give me enough time to submit them."  After Father admitted none of the motions had been filed, the court informed him it would not consider oral motions in limine, but told him he could still object when objectionable testimony was presented.

### 4.    Testimony

Three witnesses testified: Mother was called as a witness on her own behalf, and Amy Collins (Father's sister) and Yolany Guzman (a parent at the school Alyssa attended

14

when she was in Father's custody) were called on Father's behalf.

Mother testified to her opinion as to when Father should be permitted to have unmonitored visits with Alyssa; how Father exercised his current visitation rights with Alyssa; her belief that her mother took care of Alyssa the majority of the time between 2014 and 2017 (when Alyssa was supposed to be in Father's custody); the October 2017 incident in which she believed Father was intoxicated when Mother was returning Alyssa to his custody; and her sobriety.[12]  Toward the end of Father's cross-examination of Mother, the court, noting that it had limited Mother's examination by her own counsel and intended to limit Father's cross-examination as well, asked how much longer Father would be questioning Mother.  Father estimated he had another five minutes.  The court replied, "very well, proceed."  Father then examined Mother on a few more topics and concluded, "No further questions."  Nothing in the record indicates that time constraints precluded Father from exploring any topics with Mother.

Amy Collins testified that she had noticed Mother had a black eye at one point and when Collins asked what had

---

[12]    Mother admitted she had not completed the 90 consecutive days of Alcoholics Anonymous meetings ordered by the court in 2014, but claimed she did attend AA meetings three time a week, and currently attended "Celebrate Recovery" four times a week. Dr. Arden's report described "Celebrate Recovery" as a "faith-based AA twelve step program."

happened, Mother explained her husband had hit her in the face and dragged her by her hair. Collins claimed she had informed Dr. Arden of this incident.[13]

Yolany Guzman testified that she volunteered at the school Alyssa attended while in Father's custody, and was present when the children were dropped off at school. Alyssa was usually dropped off by Father, and Guzman saw Alyssa's maternal grandmother drop her off only two or three times. Additionally, Guzman frequently saw Father at Alyssa's school performances, but saw Mother there only twice.

After Guzman was excused, Father stated that his final witness had been unable to come that day, and requested the court adjourn proceedings until the next day. However, Father had no subpoena showing the witness had been served, and the court denied Father's request to adjourn, stating it would not "waste an hour and 15 minutes of court time" when the court had "no assurance that [the witness] will even show up tomorrow or that the court can order him to show up tomorrow." Father then rested, and both parties gave closing arguments.[14]

---

[13] Though the report does contain statements from Collins, it makes no mention of this incident. However, the report contains several instances where witnesses opined there was no domestic violence in Mother's household, while Father and his other sister (Sara) opined Mother was being "abused by her husband."

[14] Father made no offer of proof concerning the witness's anticipated testimony.

### E.    *The Court Issues a Judgment*

On April 11, the court issued a tentative ruling, which would become the order of the court absent either a timely request for statement of decision, or a proposal for rulings not included in the tentative decision.[15]  In August 2019, the court issued its judgment, in which it stated it had "carefully considered and weighed the evidence before it . . . ."  In relevant parts, the judgment provided that Mother and Father were to share joint legal custody of Alyssa, but that Mother would have the final authority to make all education, medical, and general welfare decisions about Alyssa.  Primary physical custody of Alyssa was awarded to Mother, and Father was granted monitored visits with Alyssa every weekend (alternating between Los Angeles and Bakersfield) and unmonitored phone calls.  After 120 days of compliance from Father regarding hair follicle testing, the parties could attempt to change the custody and visitation orders.  No child support was ordered, and the court reserved jurisdiction on the issue of reallocating Dr. Arden's fees, which had been borne solely by Mother.  The court also found that Dr. Arden's conclusions were "well-reasoned and founded on fact," and that Father had not "use[d] the agreed upon procedure . . . to produce Dr. Arden in Court."  The court additionally found that both parties "had significant

---

[15]    Father requested a statement of decision, but the court found the request legally insufficient because it violated "the rule that ultimate facts be the subject of a Statement of Decision."  He does not assign error to that ruling on appeal.

17

issues with substance abuse" but Mother had "confronted her substance abuse issues head on and has been in control of them for several years." Further, the court found "[t]he current situation could have been easily avoided by [Father] if he had merely followed the Court's order regarding testing, yet he willfully refused to comply." Referencing the "hair follicle test order of November 27, 2017," the court stated Father had stipulated to random and monitored drug and alcohol hair follicle testing twice a month.

Father moved for a new trial. The court (Judge Treu) denied Father's motion, finding that Father's stated reasons for a new trial -- irregularity in the proceedings, accident or surprise, newly discovered evidence, insufficiency of the evidence, and error of law -- "were not shown to be true." Father timely appealed.

## DISCUSSION

### A. *The Court Did Not Err in Ordering Father to Undergo Hair Follicle Drug Testing*

At the November 2017 hearing, after the court (Judge Goldberg) discussed drug testing with both parties, it summarized by stating: "So both of you are stipulating we're going to have an order for random alcohol and drug testing. It can be through a hair follicle testing. Is that correct, ma'am? Is that correct, sir?" Both parties responded, "yes." The minute order from the hearing similarly reflected that

18

"Petitioner and Respondent agree to undergo random hair follicle testing, on 24 hour notice, twice per month."

On appeal, Father contends the court erred in ordering him to drug test without meeting the requirements of Family Code section 3041.5, and that because the drug-testing order was invalid, he was deprived of his constitutional rights when other decisions were based on his noncompliance with that order. The record belies his claim. As Judge Moor properly found, the drug-testing order was not issued pursuant to Family Code section 3041.5, but rather arose from a stipulation between the parties. In the November 2017 hearing, Judge Goldberg repeatedly emphasized to Father that he need not agree to testing, and expressly asked whether he was stipulating to drug testing; Father confirmed he was. Thus, there is no merit to Father's argument that the drug-testing order was void for want of compliance with Family Code section 3041.5.[16]

Father additionally argues the drug-testing order was void because he was unaware he could refuse to agree to it. Again, the record is to the contrary. Judge Goldberg asked Father directly, in clear and understandable language, whether he was "okay with the court making an order for drug and alcohol testing or not?" Father responded, "Yes." Later, emphasizing that the choice was Father's, the court

---

[16] Because we reject Father's challenge to the agreed upon order, we also reject his argument that subsequent courts erred in enforcing the order or in basing decisions on noncompliance with the order.

19

explained: "Sir, if you don't want to agree, that's fine," noting that some people voluntarily agreed to drug testing to demonstrate they were not using or abusing substances. Father responded, "Yes, it's fine." The record thus leaves no doubt that Father knowingly and voluntarily agreed to testing.[17]

### B. *Any Orders Altering Custody Arrangements on an Ex Parte Basis Were Superseded by the Final Judgment*

In both December 2017 and January 2018, the court (Judge Lewis and Judge Moor, respectively) granted Mother's request to alter Alyssa's custody arrangements based on Father's refusal to submit to hair follicle testing. Father argues the court erred in myriad ways in granting this request.

However, 16 months after this order was made, the parties participated in a trial that resulted in a judgment addressing Alyssa's custody, superseding the orders issued by Judge Lewis and Judge Moor. Therefore, we need not consider whether the court erred in altering custody on an ex parte basis because, regardless of the merits of Father's argument, we can grant no relief.

---

[17] Father also argues that "the court's use of the word 'willful'" in discussing his failure to comply with the drug-testing order "gives the impression of adjudication for contempt," and argues the courts did not follow the requirements for adjudicating contempt. Father cites nothing in the record to support a claim that any court ever found him in contempt.

C.    *The Admission of Dr. Arden's Report into Evidence Did Not Deny Father Due Process*

At the April 2019 trial, the court admitted Dr. Arden's custody evaluation report into evidence. Father argues that doing so violated his right to due process because: (1) he was unable to cross-examine Dr. Arden; (2) *Sanchez* rendered the report inadmissible and Father's *Sanchez* waiver was invalid because it was not intelligently made; (3) the court precluded testimony from witnesses whose statements were included in Dr. Arden's report; (4) Dr. Arden failed to comply with the Rules of Court, the statutes under which he was appointed, and the order appointing him; and (5) portions of the report were factually incorrect.[18] As explained below, we reject these arguments.

1.    **Father Forfeited the Right to Cross-Examine Dr. Arden**

Father was unable to cross-examine Dr. Arden because he failed to follow the requirements to compel Dr. Arden to appear and testify at trial. The parties had stipulated that "any subpoena requiring Dr. Arden [to appear] at trial . . .

---

[18]    Father also argues the court erred in reserving jurisdiction on the issue of reallocation of Dr. Arden's fees (which Mother had paid). We are unclear why Father believes this reservation is erroneous. To the extent he is arguing that, as a matter of law, it would be unjust to allocate any of Dr. Arden's fees to him, or that the court would err if it allocated fees without determining their reasonableness, those arguments are not yet ripe, as Father does not claim that the court has allocated any fees to him.

will be hand-delivered to his office . . . at least ten (10) court days prior to the appearance date, unless other arrangements are made with Dr. Arden prior to issuing a subpoena . . . ." It was further stipulated that "the party requiring Dr. Arden's appearance shall deposit $3,000.00 with the subpoena at his office at least ten (10) court days prior to the appearance date to cover one day of expert witness fees."

Nothing in the record demonstrates Father ever deposited the required fee with Dr. Arden's office. Additionally, when the court asked about Father's efforts to serve Dr. Arden with a trial subpoena, Father produced a due diligence declaration describing failed attempts to serve Dr. Arden with document subpoenas. After the court asked whether there was a declaration regarding service of a trial subpoena, Father claimed he did not "have that with me today." On appeal, Father cites nothing to show he ever attempted to serve Dr. Arden with a trial subpoena, and our independent review of the record also reveals nothing. Because Father failed to follow the agreed procedure to compel Dr. Arden's presence at trial, the court did not err in accepting the report into evidence despite Father's inability to cross-examine Dr. Arden.

## 2. The *Sanchez* Waiver Was Valid

Father contends that without a *Sanchez* waiver, Dr. Arden's report would be inadmissible and that his *Sanchez* waiver was ineffective because *Sanchez* "was not

22

properly explained to Father . . . ." We reject this argument. First, at trial -- more than 16 months after the *Sanchez* waiver -- the court asked Father if he agreed that "*Sanchez* was waived by stipulation on November 27, 2017," and Father responded, "Yes," without any suggestion that the waiver was infirm. A party may not complain on appeal that evidence was inadmissible on a certain ground unless he made a timely and specific objection on that ground below. (Evid. Code, § 353 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].) Accordingly, Father has forfeited this argument.

Second, the record contradicts Father's claim of ignorance. When asked by the court if he was "okay with the evaluation coming in subject to cross-examination?" Father responded with an unequivocal "yes." Father fails to elaborate on what was not "properly explained" to him, or what he supposedly misunderstood. Indeed, in the stipulation Father signed for the order appointing Dr. Arden, Father agreed that "Dr. Arden's report shall be received in evidence without foundation or objection, subject to the parties' right to engage in direct and cross-examination of Dr. Arden."

23

### 3. The Court Did Not Preclude Father from Calling Witnesses

Father contends the trial court "blocked the ability of father to call any witnesses who spoke to Arden." This is incorrect. Rather, the court sensibly asked the parties to: "Bear in mind that the court does not wish duplicative testimony and that with respect to these witnesses that you are going to call, the court expects them to have new and fresh evidence and not just merely restate what somebody else may have said, particularly in view of the fact that the comprehensive report . . . is in evidence." In other words, because the report was already in evidence, the court did not wish to hear witnesses repeat statements contained therein.

Moreover, after Guzman testified at trial, there remained 75 minutes of court time. Father informed the court that he had one more witness, who was not present, but could appear the next day. Because Father could not produce a subpoena showing the witness was required to appear, the court denied Father's request to adjourn the hearing. Nothing in the record indicates Father either attempted to or was precluded from calling any other witness.

Additionally, neither below nor on appeal has Father suggested what prejudice resulted from the court's ruling. He made no offer of proof below regarding the witness's anticipated testimony, and on appeal fails to articulate how his failure to call the witness operated to his detriment. He has thus failed to show reversible error. (See, e.g., *F.P. v.*

24

*Monier* (2017) 3 Cal.5th 1099, 1107-1108 [California Constitution expressly precludes reversal absent prejudice].)

### 4.     Dr. Arden's Alleged Violations

Father contends the court erred in admitting Dr. Arden's report into evidence because Dr. Arden violated the Rules of Court, California statutes, and the order appointing him.  We briefly address and reject each of Father's arguments below.

### (a)     Accepting Payments from Mother After the Report Was Distributed

Father complains Dr. Arden violated the order appointing him by accepting payments from Mother after the report was filed, even though the stipulation appointing him stated that "[t]he parties understand . . . all outstanding fees must be paid prior to the distribution of the report."  But Father provides no authority or cogent argument as to why Dr. Arden's apparent agreement to release the report prior to Mother's paying all of the required fee would be a basis for excluding the report.  To the extent Father suggests this arrangement demonstrates bias by Dr. Arden, Father does not explain the connection between the two events, and we discern none.

### (b) Failing to Respond to a Mailed Subpoena

Father contends Dr. Arden failed to respond to a mailed document subpoena. Father provides no authority stating that such a failure should affect the admissibility of the report. The parties stipulated that the report would be admissible, only "subject to the parties' right to engage in direct and cross-examination of Dr. Arden."

### (c) Failing to Follow Rule 5.220 of the California Rules of Court

Rule 5.220 of the California Rules of Court requires that "[i]n performing an evaluation, the child custody evaluator must:  [¶] (1) Maintain objectivity, provide and gather balanced information for both parties, and control for bias; [¶] (2) Protect the confidentiality of the parties and children in collateral contacts and not release information about the case to any individual except as authorized by the court or statute; [¶] . . . [¶] (4) Consider the health, safety, welfare, and best interest of the child in all phases of the process . . . ."  (Cal. Rules of Court, rule 5.220(j)(2).)  Father argues Dr. Arden "fail[ed] to follow each one of these rules," and therefore the court's admission of the report "was overtly prejudicial to father's case."  This is a conclusory statement without supporting facts, authority, or indeed logical argument, and thus is forfeited.  (*WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 ["In order to demonstrate error, an appellant must

26

supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record"]; *ibid.* ["Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority"].)

### (d)   Failing to File Form FL-326

Father contends Dr. Arden never filed form FL-326 as required under California Rules of Court rule 5.225.[19]  But Father cites to nothing in the record demonstrating he ever objected to the admission of the report on that ground, nor have we come across such an objection in our own review of the record.  Therefore, this argument is forfeited.  (Evid. Code, § 353.)

### (e)   Engaging in Ex Parte Communications with Mother's Counsel and Husband

In the stipulation for the order appointing Dr. Arden, the parties agreed that counsel were not permitted to "engage in unilateral communication with Dr. Arden, except for administrative matters, e.g., scheduling or billing."

---

[19]     Form FL-326 is a "Declaration of Private Child Custody Evaluator Regarding Qualifications."

27

Father accuses Dr. Arden of engaging in improper ex parte communications with Mother's counsel and husband.

Nothing in the record demonstrates Mother's counsel had any improper ex parte communications with Dr. Arden. Father claims that the day he gave notice of an ex parte hearing, Mother's counsel sent him an e-mail at 12:03 p.m. stating that "Dr. Arden was almost done or finished with his evaluation." Twenty-six minutes later, Dr. Arden sent an e-mail stating he was done with his report. Father claims the proximity in time of the two e-mails proves Mother's counsel had an improper ex parte communication with Dr. Arden. We disagree. First, we note that Father fails to cite to the alleged e-mail from Mother's counsel. Second, even if the e-mail existed, there is no evidence Mother's counsel had any specific knowledge that Dr. Arden's report would be finished within the hour -- counsel may have been giving his general understanding that Dr. Arden was nearing the end of his work. Finally, even had Mother's counsel known that the conclusion of Dr. Arden's work was imminent, this alone is insufficient proof that an improper communication occurred.

Father also contends Mother's husband admitted an "illegal ex parte agreement with the evaluator to violate terms of the order appointing him." However, the "agreement" referenced by Father is one that was described in a declaration by Mother's husband, attesting that because the child custody evaluation was a large expense, "it was necessary to make irregular payments of varying amounts to

28

Dr. Arden," and both Mother and her husband had communicated via e-mail with Dr. Arden to discuss such payments. Discussions regarding "billing" were explicitly excluded from the prohibition of ex parte communications.

      **(f)    Engaging in a "Biased Collection" of Documents and Failing to Interview Three of Father's Witnesses**

Father accuses Dr. Arden of refusing to review records corroborating Father's claims and failing to interview three of his witnesses. First, by Father's own account, Dr. Arden provided only a "partial list" of documents he reviewed. As such, there is no evidence that Dr. Arden failed to review the records Father references. Second, Father cites nothing in the record demonstrating these documents were provided to Dr. Arden. Most important, the parties stipulated that Dr. Arden had the "right to determine the information he deems significant and relevant to the evaluation." Without evidence of Dr. Arden's supposed bias, the court did not err in admitting his report despite Father's unsupported contention that Dr. Arden did not review certain documents or failed to interview three witnesses.

### (g) Failing to Consider Mother's Substance Abuse Issues

Father claims Dr. Arden failed to consider Mother's substance abuse issues.  Father is mistaken.  Several pages of Dr. Arden's report discuss Mother's substance abuse issues, as well as his conclusion concerning her sobriety.

### (h) Including Opinions Outside the Evaluator's Expertise

Father contends Dr. Arden improperly "act[ed] as a lawyer" when he opined that Father demonstrated contempt of court orders.  In the context of the report, it is clear Dr. Arden was not making a legal ruling, and there is no evidence the court either interpreted the statement in that manner, or based its own ruling on such an understanding of Dr. Arden's opinion.

### (i) Reaching Incorrect Factual Conclusions

Father accuses Dr. Arden of reaching several incorrect factual conclusions in his report (e.g., as to whether domestic violence had ever occurred between Mother and Father, whether Mother was sober, etc.).  But Dr. Arden's opinions were evidence the court was entitled to consider; nothing prevented Father from putting on conflicting evidence.  The court did not err in receiving the report into evidence simply because Father disagreed with Dr. Arden's opinions.

### D. *The Court Had No Sua Sponte Duty to "Recognize . . . Collusion"*

Father argues the court abdicated its duty to "recognize" that Mother's counsel and Dr. Arden were colluding and "admonish" them. First, as discussed above, there is no evidence of "collusion." Second, Father provides no authority stating the court has a sua sponte duty to "recognize" the parties were colluding. *In re Marriage of Laurenti* (2007) 154 Cal.App.4th 395, which Father cites to support his conclusion, is inapposite. In *Laurenti*, after the mother successfully moved the court to disqualify a custody evaluator, the court ordered her to pay the evaluator's requested fees, but failed to determine whether the fees were reasonable. (*Id.* at 402-403.) The appellate court found this failure to be an "abdication" of the trial court's duties. (*Id.* at 403.) *Laurenti* has nothing to do with a duty to "recognize . . . collusion" and "admonish" against it.

### E. *The Court Did Not Err in Refusing to Continue the Trial*

Five days before trial, Father filed an ex parte application to continue the trial, arguing he had received certain documents only the previous day and had not had sufficient time to review them before trial. The court (Judge Lewis) denied the application, finding "[n]o good cause."

At trial, Father renewed his request to continue the trial for the same reason, but acknowledged that his prior

request had been denied.  Father proffered no new facts, and the trial court (Judge Treu) declined to revisit that ruling.

On appeal, Father argues it was an abuse of discretion to deny his request to continue the trial.  It is unclear whether he is arguing that Judge Lewis abused his discretion in denying Father's ex parte application, that Judge Treu abused his discretion in declining to revisit Judge Lewis's ruling, or both.  In any event, we find none of the contentions has merit.

As to Judge Lewis's denial of Father's ex parte request, it did not exceed the bounds of reason to conclude that the production of "over 400 pages of discovery" a week before trial did not constitute good cause to continue that trial.  Moreover, having now had several years to review these documents, Father fails to explain how the outcome of the trial would have changed had he been given more time.  As to Judge Treu's refusal to revisit Judge Lewis's ruling, the record discloses no new facts or law proffered by Father to support what was essentially a motion for reconsideration.  Accordingly, it did not exceed the bounds of reason for Judge Treu to decline to make a different ruling.

### F.    *Father Was Not Denied Due Process*

Father contends the court denied him due process by: (1) limiting his witnesses; (2) limiting his cross-examination of Mother; (3) failing to hear his motion to strike Dr. Arden's report; (4) failing to consider his motions in limine; and (5)

32

failing to rule on certain important issues. These arguments are without merit.

### 1. Limiting Father's Witnesses

As discussed above, the court did not limit Father's witnesses; it requested the parties not proffer testimony that was already contained in Dr. Arden's report. The court did not prevent Father from calling witnesses to challenge the contents of the report or to testify to matters not contained within the report. Nor did Father make an offer of proof below regarding any witness's anticipated testimony, and on appeal fails to articulate what prejudice he incurred from the inability to present any such testimony.

### 2. Limiting Father's Examination of Mother

During Father's cross-examination of Mother, the court stated that it had limited Mother's direct examination by her own counsel, and would similarly limit Father's cross-examination; it asked how much longer Father's examination would take. Father estimated he had another five minutes. The court permitted him to proceed, and Father examined Mother on a few more topics before stating, "No further questions." Nothing in the record indicates time constraints precluded Father from questioning Mother on any topic.

### 3. Hearing Father's Motion to Strike

Father claims he was prejudiced because his motion to strike Dr. Arden's report was not heard before trial. But he filed the motion in March 2019 with a hearing date of May 29, 2019 -- more than seven weeks after trial -- and nothing in the record indicates he attempted to have the hearing date advanced, or even that he asked the trial court to rule on the motion. We find the trial court did not err in failing to advance and rule on Father's motion sua sponte.

### 4. Declining to Consider Father's Motions in Limine

When Father raised the issue of his motions in limine at trial, the court asked why the motions were not in writing. Father claimed he had drafted written motions but that the "discovery issues . . . didn't give me enough time to submit them." The court informed him it would not consider oral motions in limine, but advised Father he could still object to any arguably objectionable testimony offered at trial. Father does not explain how the court erred in failing to consider unfiled motions, or how this alleged failure prejudiced him, given his ability to object to any inadmissible evidence during trial.

### 5. Ruling on Significant Issues

Finally, Father argues the court erred by not ruling on the issues of: (a) whether hair follicle testing was ordered; (b) whether custody of Alyssa should have been altered on an ex

parte basis; (c) whether Mother was sober; and (d) whether domestic violence occurred in Mother's household. Father's arguments are without merit.

First, by finding that "[t]he current situation could have been easily avoided by [Father] if he had merely followed the Court's order regarding testing" and referencing the "hair follicle test order of November 27, 2017" whereby Father had stipulated to random and monitored drug and alcohol hair follicle testing twice a month, the court self-evidently found that hair follicle testing had been ordered. Second, as discussed above, it is irrelevant whether the court erred in changing Alyssa's custody on an ex parte basis, because that order has been superseded. Third, the court found that Mother "had significant issues with substance abuse" but had "confronted her substance abuse issues head on and has been in control of them for several years." And finally, while the court did not make an express finding that no domestic violence occurred in Mother's household, the court did state it had "carefully considered and weighed the evidence before it . . . ." The evidence before it included the conflicting testimony regarding whether domestic violence occurred in Mother's household.

## DISPOSITION

We dismiss the portion of the appeal challenging the court's October 2019 order denying Father's motion for a new trial. In all other respects, the judgment is affirmed. As respondent did not appear, no costs are awarded.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.